DAVIS, Judge.
*43 The Diocese of Raleigh ("the Diocese") and Michael F. Burbidge, the Bishop of the Diocese ("Bishop Burbidge") (collectively "the Diocese Defendants") appeal from the trial court's 2 June 2014 order granting in part and denying in part their motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the North Carolina Rules of Civil Procedure. On appeal, the Diocese Defendants argue that the adjudication of the remaining claims asserted against them would require a North Carolina civil court to impermissibly entangle itself in ecclesiastical matters and that these claims must therefore be dismissed for lack of subject matter jurisdiction based on the First Amendment. After careful review, we affirm in part and reverse in part.
Factual Background
On 12 November 2013, John Doe 200[1] ("Plaintiff") filed a complaint in Wake County Superior Court against the Diocese, Bishop Burbidge, and Edgar Sepulveda ("Sepulveda"). In his complaint, Plaintiff alleged that Sepulveda, a priest who was incardinated to the Diocese, sexually assaulted him on multiple occasions beginning in May of 2009 when Plaintiff was sixteen years old.[2] Plaintiff asserted that he was involved in youth activities at Sepulveda's parish and that Sepulveda had begun to "cultivate a special relationship with [him], and began to groom him for sexual assault by exhibiting frequent physical contact with [him] ... through hugs and embraces." Plaintiff alleged that the first sexual assault occurred when Sepulveda invited Plaintiff to spend the night at his home and that the second incident took place when Sepulveda, "using his stature as a priest," secured an invitation to spend the night at Plaintiff's home.
Plaintiff's complaint stated that he reported the sexual abuse in September of 2009, and, in response, Sepulveda was suspended by the *44 Diocese. Plaintiff alleged that when he subsequently requested that the Diocese Defendants compel Sepulveda to undergo testing to determine whether he carried a sexually transmitted disease ("STD") that could have been passed to Plaintiff, this request was refused.
In his complaint, Plaintiff asserted claims for assault and battery against Sepulveda and claims for negligence, negligent infliction of emotional distress ("NIED"), and vicarious liability against the Diocese Defendants. Specifically, Plaintiff alleged that the Diocese Defendants failed to (1) protect Plaintiff from the danger they knew or should have known was posed by Sepulveda by negligently supervising him; (2) educate Plaintiff "about the proper boundaries a priest should observe as to physical touch"; and (3) compel Sepulveda to undergo STD testing and provide the results of such testing to Plaintiff. Plaintiff's NIED claims were likewise based on the Diocese Defendants' failure to protect him from Sepulveda and their refusal to require him to submit to STD testing. The vicarious liability claim against the Diocese *33 Defendants was grounded in theories of respondeat superior, apparent agency, and the non-delegable duty doctrine. Plaintiff sought in his prayer for relief compensatory damages, punitive damages, and injunctive relief in the form of an order compelling Sepulveda to undergo STD testing.
On 24 January 2014, the Diocese Defendants filed a motion to dismiss Plaintiff's claims against them based on lack of subject matter jurisdiction pursuant to Rule 12(b)(1) and failure to state a claim upon which relief can be granted under Rule 12(b)(6). In support of their motion, the Diocese Defendants filed an affidavit from Bishop Burbidge setting out basic tenets from the Code of Canon Law, "the universal law of the Roman Catholic Church."[3] In his affidavit, Bishop Burbidge explained that the role of priests, the relationship between a bishop and his priests, and the procedure for removing a priest from his clerical office are all informed by the Code of Canon Law. Bishop Burbidge further discussed policies and procedures that the Roman Catholic Church has enacted to ensure the protection of minors from sexual abuse.
*45 The Diocese Defendants' motion came on for hearing before the Honorable Donald W. Stephens on 27 May 2014. On 2 June 2014, Judge Stephens entered an order dismissing (1) Plaintiff's vicarious liability claim; and (2) the portion of Plaintiff's negligence claim premised on the Diocese Defendants' failure to educate Plaintiff as to the proper boundaries concerning physical contact between priests and parishioners.[4] The trial court's order denied the Diocese Defendants' motion as to the remaining claims asserted against them in the complaint. The Diocese Defendants timely appealed to this Court.
Analysis
I. Appellate Jurisdiction
As an initial matter, we note that the order from which the Diocese Defendants are appealing is interlocutory as it did not dispose of all of Plaintiff's claims.[5] See Turner v. Norfolk S. Corp., 137 N.C.App. 138, 141, 526 S.E.2d 666, 669 (2000) ("An order or judgment is interlocutory if it is made during the pendency of an action and does not dispose of the case but requires further action by the trial court in order to finally determine the entire controversy." (citation and quotation marks omitted)). While a right to immediate appeal does not generally lie from an interlocutory order, appellate review of an interlocutory order is permissible if (1) the order constitutes a final determination as to some, but not all, of the claims between the parties, and the trial court certifies the order for immediate appeal pursuant to Rule 54(b) ; or (2) "the order implicates a substantial right of the appellant that would be lost if the order was not reviewed prior to the issuance of a final judgment." Keesee v. Hamilton, ---N.C.App. ----, ----, 762 S.E.2d 246, 249 (2014).
As noted above, the Diocese Defendants moved for dismissal of Plaintiff's complaint in the trial court on two grounds: (1) lack of subject matter jurisdiction under Rule 12(b)(1) ; and (2) failure to state a valid claim for relief under Rule 12(b)(6). The Diocese *34 Defendants concede *46 that the trial court's partial denial of their motion to dismiss under Rule 12(b)(6) "does not involve immediately appealable issues." See Bolton Corp. v. T.A. Loving Co., 317 N.C. 623, 629, 347 S.E.2d 369, 373 (1986) ("A ruling denying a motion to dismiss pursuant to N.C.G.S. § 1A-1, Rule 12(b)(6) is ordinarily a nonappealable interlocutory order."). Therefore, the question of whether Plaintiff's complaint was sufficient to state a valid claim for relief against the Diocese Defendants under Rule 12(b)(6) as to those claims left undisturbed by the trial court's order is not before us.
However, the Diocese Defendants do contend that appellate jurisdiction exists as to their appeal of the trial court's ruling on their Rule 12(b)(1) motion. It is this aspect of the trial court's ruling that forms the entire basis for this appeal.
It is well settled that an assertion that a civil court is precluded on First Amendment grounds from adjudicating a claim constitutes a challenge to that court's subject matter jurisdiction. Tubiolo, 167 N.C.App. at 326, 605 S.E.2d at 163 ; see also Harris v. Pembaur, 84 N.C.App. 666, 667, 353 S.E.2d 673, 675 (1987) (explaining that "[s]ubject matter jurisdiction refers to the power of the court to deal with the kind of action in question" and is conferred either statutorily or constitutionally).
In Harris v. Matthews, 361 N.C. 265, 643 S.E.2d 566 (2007), our Supreme Court addressed whether there is appellate jurisdiction over a trial court's interlocutory order denying a church's motion to dismiss for lack of subject matter jurisdiction based on the assertion that "a civil court action cannot proceed [against a church defendant] without impermissibly entangling the court in ecclesiastical matters." Id. at 270, 643 S.E.2d at 569. The Supreme Court concluded that the order was immediately appealable because the defendant would be "irreparably injured if the trial court becomes entangled in ecclesiastical matters from which it should have abstained." Id. at 271, 643 S.E.2d at 570. In so holding, the Court noted that "[t]he constitutional prohibition against court entanglement in ecclesiastical matters is necessary to protect First Amendment rights identified by the 'Establishment Clause' and the 'Free Exercise Clause' " and that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Id. at 270, 643 S.E.2d at 569 (citation and quotation marks omitted).
As in Harris, the Diocese Defendants in the present case contend that the claims asserted against them in Plaintiff's complaint would require a civil court to delve into issues concerning "the Roman Catholic Church's religious doctrine, practices, and canonical law" in order to *47 resolve the controversy between the parties-an intrusion that is prohibited by the First Amendment. See id. at 275, 643 S.E.2d at 572 ("[W]hen a party challenges church actions involving religious doctrine and practice, court intervention is constitutionally forbidden."). Consequently, we conclude that we have jurisdiction over this appeal and proceed to address the merits of the Diocese Defendants' arguments. See id. at 270, 643 S.E.2d at 569-70 (" [W]hen First Amendment rights are threatened or impaired by an interlocutory order, immediate appeal is appropriate.").
II. Subject Matter Jurisdiction
A. First Amendment's Prohibition Against Excessive Entanglement in Ecclesiastical Matters
The Establishment Clause and the Free Exercise Clause of the First Amendment prohibit any "law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. "As applied to the states through the Fourteenth Amendment, the First Amendment also restricts action by state governments and the servants, agents and agencies, of state governments." Hill v. Cox, 108 N.C.App. 454, 461, 424 S.E.2d 201, 206 (1993) (citation and quotation marks omitted). As such, the civil courts of North Carolina are prohibited "from becoming entangled in ecclesiastical matters" and have no jurisdiction over disputes which require an examination of religious doctrine and practice in order to resolve the matters at issue. Johnson v. Antioch United Holy *35 Church, Inc., 214 N.C.App. 507, 510, 714 S.E.2d 806, 810 (2011) ; see W. Conference of Original Free Will Baptists of N.C. v. Creech, 256 N.C. 128, 140, 123 S.E.2d 619, 627 (1962) ("The legal or temporal tribunals of the State have no jurisdiction over, and no concern with, purely ecclesiastical questions and controversies...." (citation and quotation marks omitted)).
An ecclesiastical matter is one which concerns doctrine, creed, or form of worship of the church, or the adoption and enforcement within a religious association of needful laws and regulations for the government of membership, and the power of excluding from such associations those deemed unworthy of membership by the legally constituted authorities of the church; and all such matters are within the province of church courts and their decisions will be respected by civil tribunals.
E. Conference of Original Free Will Baptists of N.C. v. Piner, 267 N.C. 74, 77, 147 S.E.2d 581, 583 (1966) (citation and quotation marks *48 omitted), overruled in part on other grounds by Atkins v. Walker, 284 N.C. 306, 200 S.E.2d 641 (1973). This Court has previously explained that "[t]he prohibition on judicial cognizance of ecclesiastical disputes is founded upon both establishment and free exercise clause concerns" because (1) by hearing religious disputes, a civil court could influence associational conduct, "thereby chilling the free exercise of religious beliefs"; and (2) " by entering into a religious controversy and putting the enforcement power of the state behind a particular religious faction, a civil court risks 'establishing' a religion." Emory v. Jackson Chapel First Missionary Baptist Church, 165 N.C.App. 489, 492, 598 S.E.2d 667, 670 (2004) (citation omitted).
In Harris, our Supreme Court provided a comprehensive articulation of the considerations a civil court must take into account when determining whether it may adjudicate claims involving religious entities. Harris, 361 N.C. at 271-74, 643 S.E.2d at 570-72. The plaintiffs in Harris, members of the congregation of Saint Luke Missionary Baptist Church, filed a civil complaint on behalf of the church based on their contention that the church's interim pastor had misappropriated church funds. Id. at 268, 643 S.E.2d at 568. In their complaint, the plaintiffs asserted claims for conversion of funds, breach of fiduciary duty, and civil conspiracy against the interim pastor, the church secretary, and the chairman of the board of trustees. Id. The pastor moved to dismiss the claims against him for lack of subject matter jurisdiction on First Amendment grounds, and the trial court denied his motion. The Supreme Court held that the First Amendment prohibited the adjudication of the plaintiffs' claims, which were predicated on allegations that the pastor had "usurped the governmental authority of the church's internal governing body." Id. at 272, 643 S.E.2d at 571.
Plaintiffs do not ask the court to determine who constitutes the governing body of Saint Luke or whom that body has authorized to expend church resources. Rather, plaintiffs argue Saint Luke is entitled to recover damages from defendants because they breached their fiduciary duties by improperly using church funds, which constitutes conversion. Determining whether actions, including expenditures, by a church's pastor, secretary, and chairman of the Board of Trustees were proper requires an examination of the church's view of the role of the pastor, staff, and church leaders, their authority and compensation, and church management. Because a church's *49 religious doctrine and practice affect its understanding of each of these concepts, seeking a court's review of the matters presented here is no different than asking a court to determine whether a particular church's grounds for membership are spiritually or doctrinally correct or whether a church's charitable pursuits accord with the congregation's beliefs. None of these issues can be addressed using neutral principles of law.
Here, ... in order to address plaintiffs' claims, the trial court would be required to interpose its judgment as to both the proper role of these church officials and whether each expenditure was proper in light of Saint Luke's religious doctrine and practice, to the exclusion of the judgment of the church's duly constituted leadership.
*36 This is precisely the type of ecclesiastical inquiry courts are forbidden to make.
Id. at 273, 643 S.E.2d at 571.
Thus, although Harris -unlike the present case-involved an internal church governance dispute, the principles set out therein concerning the limitations placed by the First Amendment on the subject matter jurisdiction of civil courts to adjudicate claims against religious entities are equally applicable here. "The dispositive question is whether resolution of the legal claim[s] requires the court to interpret or weigh church doctrine. If not, the First Amendment is not implicated and neutral principles of law are properly applied to adjudicate the claim." Smith v. Privette, 128 N.C.App. 490, 494, 495 S.E.2d 395, 398, appeal dismissed, 348 N.C. 284, 501 S.E.2d 913 (1998).
Therefore, we must examine each of Plaintiff's remaining causes of action against the Diocese Defendants in order to determine whether its adjudication would require "an impermissible analysis by the court based on religious doctrine or practice." Antioch United Holy Church, 214 N.C.App. at 511, 714 S.E.2d at 810 ; see Harris, 361 N.C. at 274, 643 S.E.2d at 572 (explaining that once it becomes clear "that no neutral principles of law exist[ ] to resolve plaintiffs' lawsuit, continued involvement by the trial court [is] unnecessary and unconstitutional"). Because we review de novo a trial court's ruling on a motion to dismiss for lack of subject matter jurisdiction, we consider the matter anew and freely substitute our own judgment for that of the trial court. Burgess v. Burgess, 205 N.C.App. 325, 327, 698 S.E.2d 666, 668 (2010).
*50 B. Negligence Claims
1. Negligent Supervision
Plaintiff's primary claim against the Diocese Defendants seeks to impose liability against them on a theory of negligent supervision. Plaintiff asserts in his complaint that the Diocese Defendants "knew, or should have known, that children needed to be protected from Sepulveda" because of his "sexual interest in children" and "failed to protect [Plaintiff] from the dangers" Sepulveda presented.
North Carolina law recognizes a cause of action for negligent supervision against an employer where the plaintiff establishes the existence of the following elements:
(1) the specific negligent act on which the action is founded ... (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; and (3) either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in oversight and supervision, ...; and (4) that the injury complained of resulted from the incompetency proved.
Medlin v. Bass, 327 N.C. 587, 591, 398 S.E.2d 460, 462 (1990) ( (citation, quotation marks, and emphasis omitted)); see Wilkerson v. Duke Univ., --- N.C.App. ----, ----, 748 S.E.2d 154, 160 (2013) (explaining that such claims require proof "that the incompetent employee committed a tortious act resulting in injury to plaintiff and that prior to the act, the employer knew or had reason to know of the employee's incompetency" (citation omitted)). Our Supreme Court has recognized that with regard to such claims, the employer's liability for the injury caused by his employee is "entirely independent of the employer's liability under the doctrine of respondeat superior. " Braswell v. Braswell, 330 N.C. 363, 373, 410 S.E.2d 897, 903 (1991) (citation omitted).[6]
*51 The Diocese Defendants contend that the trial court should have dismissed Plaintiff's negligent supervision claim under Rule 12(b)(1) because that claim cannot be *37 resolved without excessively entangling a civil court in the examination and interpretation of church doctrine and practice. Specifically, they assert that Plaintiff's negligent supervision claim offends the First Amendment because it "directly asks the trial court-and ultimately a jury-to decide whether the Church's canon law-based doctrines and practices are 'reasonable.' "
At the outset, we observe that no clear consensus exists among courts in other jurisdictions on the issue of whether civil courts may adjudicate tort claims asserting that a religious organization was negligent in its supervision of a cleric who is accused of sexual misconduct or other tortious conduct against a third party. A number of courts have held that exercising jurisdiction over such claims does not offend the First Amendment because a religious organization's liability under such circumstances may be determined through the application of neutral principles of tort law. See Malicki v. Doe, 814 So.2d 347, 364 (Fla.2002) ("The core inquiry in determining whether the Church Defendants are liable will focus on whether they reasonably should have foreseen the risk of harm to third parties. This is a neutral principle of tort law. Therefore, based on the allegations in the complaint, we do not foresee 'excessive' entanglement in internal church matters or in interpretation of religious doctrine or ecclesiastical law."); Konkle v. Henson, 672 N.E.2d 450, 456 (Ind.Ct.App.1996) (concluding that First Amendment did not bar plaintiff's negligent supervision claim because review of that claim "only requires the court to determine if the Church Defendants knew of [minister's] inappropriate conduct yet failed to protect third parties from him. The court is simply applying secular standards to secular conduct which is permissible under First Amendment standards."); see also Roman Catholic Diocese of Jackson v. Morrison, 905 So.2d 1213, 1242 (Miss.2005) (holding that claim against church for its negligent supervision of priest accused of sexually abusing minors was not jurisdictionally barred and "reject[ing] the notion that the First Amendment provides, or was intended to provide, blanket civil immunity to churches for violation of recognized standards of conduct which results in reasonably foreseeable harm").
Other jurisdictions, conversely, have concluded that claims premised on theories of negligent supervision or retention are barred by the First Amendment because such claims "necessarily involve interpretation of religious doctrine, policy, and administration" and could result in an impermissible endorsement of religion by approving one *52 particular model of supervision. Gibson v. Brewer, 952 S.W.2d 239, 246-47 (Mo.1997) (concluding that negligent supervision claim cannot be resolved through neutral principles of law because "[a]djudicating the reasonableness of a church's supervision of a cleric-what the church 'should know'-requires inquiry into religious doctrine"); see also Ayon v. Gourley, 47 F.Supp.2d 1246, 1250-51 (D.Colo.1998) (holding that negligent supervision claim "must be dismissed as violative of the First Amendment" because "the procedures that the Archdiocese Defendants have in place regarding supervision would have to be examined to determine whether they were reasonable and adequate" and such examination "would clearly be inappropriate governmental involvement and a burden on these Defendants' exercise of religion"), aff'd, 185 F.3d 873 (10th Cir.1999) (unpublished); Swanson v. Roman Catholic Bishop of Portland, 692 A.2d 441, 445 (Me.1997) (concluding that negligent supervision claim must be dismissed because "[t]he imposition of secular duties and liability on the church ... will infringe upon its right to determine the standards governing the relationship between the church, its bishop, and the parish priest").
This is not the first occasion on which this Court has confronted this issue. In Smith v. Privette, 128 N.C.App. 490, 495 S.E.2d 395 (1998), the plaintiffs, who were members of the administrative staff for White Plains United Methodist Church of Cary ("White Plains"), filed a civil action against White Plains, the Raleigh District of the North Carolina Conference of the United Methodist Church, and the North Carolina Conference of the United Methodist Church (collectively "the church defendants"), alleging that the church defendants negligently supervised Privette, the senior pastor at White Plains *38 who had allegedly committed various "inappropriate, unwelcome, offensive and nonconsensual acts of a sexual nature" against the plaintiffs. Id. at 492, 495 S.E.2d at 396. The plaintiffs alleged in their complaint that "the [c]hurch [d]efendants knew or should have known of Privette's propensity for sexual harassment of and assault and battery upon female employees and that they failed to take any action to warn or protect the [p]laintiffs from Privette's tortious activity." Id.
The church defendants moved to dismiss the plaintiffs' claims against them for lack of subject matter jurisdiction, and the trial court granted their motion, ruling that a civil court's "second-guess[ing] the discipline of clergy is an intrusion into matters of church governance ... and would constitute an excessive entanglement between church and state thereby violating ... the First Amendment." Id. at 493, 495 S.E.2d at 396-97 (brackets omitted). On appeal, this Court reversed the trial *53 court's dismissal of the plaintiffs' negligent supervision claim, rejecting the notion that a negligent supervision claim against a religious organization necessarily requires inquiry into religious doctrine, thereby entangling civil courts in ecclesiastical matters in violation of the First Amendment. Id. at 493, 495 S.E.2d at 397. Instead, we recognized the distinction between (1) a claim seeking to impose liability for a church's decisions to hire or discharge a cleric, which we recognized as "inextricable from religious doctrine and protected by the First Amendment"; and (2) an assertion that the church was civilly liable for a minister's wrongful conduct because it knew or had reason to know of his proclivity for sexual misconduct. Id. at 495, 495 S.E.2d at 398. We expressly noted that adjudication of the latter claim would not
require[ ] the trial court to inquire into the [c]hurch [d]efendants' reasons for choosing Privette to serve as a minister. The [p]laintiffs' claim, construed in the light most favorable to them, instead presents the issue of whether the [c]hurch [d]efendants knew or had reason to know of Privette's propensity to engage in sexual misconduct....
Id.
We therefore concluded that such a claim is not barred by the First Amendment because determining whether the church defendants knew or had reason to know of its employee's proclivities for sexual wrongdoing required only the application of neutral principles of tort law, observing that "the application of a secular standard to secular conduct that is tortious is not prohibited by the Constitution." Id. at 494, 495 S.E.2d at 397 (citation, quotation marks, and brackets omitted).
We believe that the result we reached in Privette is equally applicable to Plaintiff's negligent supervision claim here. In the present case, Plaintiff has alleged that Sepulveda-an employee of the Diocese-sexually assaulted Plaintiff and that the Diocese Defendants knew or had reason to know of Sepulveda's sexual attraction to, and propensity to engage in sexual misconduct with, minors. There is no meaningful distinction between these allegations and the allegations asserted by the plaintiffs in Privette.
Notably, the Diocese Defendants have made clear in this litigation that they are not contending that the First Amendment serves as an absolute shield barring all claims seeking to hold churches civilly liable based on the sexual assaults of their clerics. Nor do they contend that Privette conflicts with our Supreme Court's decision in Harris or that Privette was wrongly decided.
*54 Instead, the Diocese Defendants attempt to distinguish Privette from the present case on two grounds. First, they contend that in Privette "the church defendants conceded that their conduct was not informed by 'the tenets or practices of the Methodist Church,' and therefore, 'there [was] no necessity for the court to interpret or weigh church doctrine in its adjudication of the plaintiffs' claim for negligent retention and supervision.' " This argument is based on a misreading of Privette. Contrary to the Diocese Defendants' assertion, the church defendants in Privette specifically argued that the determination of whether they negligently supervised Privette "necessarily requires inquiry into their religious doctrine and that such an inquiry is not permitted under the First Amendment." Id. at 493, 495 S.E.2d at 397.
*39 Rather than conceding that their supervisory role was not informed by religious doctrine, the church defendants in Privette merely acknowledged the commonsense understanding that sexual misconduct is not "part of the tenets or practices of the Methodist Church"-a proposition that is obviously equally true of the Catholic faith. Id. at 495, 495 S.E.2d at 398.
Second, the Diocese Defendants seek to distinguish Privette on the ground that the church defendants there had actual knowledge of the danger Privette posed based on prior complaints of sexual misconduct that had been made against him whereas here the complaint does not specifically allege that Sepulveda had committed sexual assaults on other victims prior to those inflicted upon Plaintiff. However, this distinction was not the basis for our holding in Privette that the plaintiffs' negligent supervision claim could be adjudicated without entangling the court in religious doctrine. In our decision, we explained that in order to establish supervisory negligence "against an employer, the plaintiff must prove that the incompetent employee committed a tortious act resulting in injury to plaintiff and that prior to that act, the employer knew or had reason to know of the employee's incompetency." Id. at 494-95, 495 S.E.2d at 398 (citation and quotation marks omitted and emphasis added). We did not hold that a plaintiff's complaint must contain allegations of actual knowledge by the church of other sexual wrongdoing by the cleric in order for a religious entity to be held liable under a negligent supervision theory consistent with First Amendment limitations. Were we to adopt the Diocese Defendants' argument on this issue, then the First Amendment would, as a practical matter, serve as a complete shield to tort liability for religious organizations in the sexual abuse context except in those cases in which the plaintiff specifically alleged prior sexual assaults by the cleric at issue. We do not believe the First Amendment requires such a result.
*55 While evidence of actual knowledge on the part of the Diocese Defendants of prior assaults by Sepulveda against other victims might strengthen Plaintiff's case against them in the eyes of a jury, the distinction between allegations of actual notice and allegations of constructive notice does not control the subject matter jurisdiction issue currently before us. Neutral principles of law allow a civil court to adjudicate Plaintiff's claim that the Diocese Defendants knew or should have known of the danger posed by Sepulveda to Plaintiff because of his sexual attraction to minors. Furthermore, a ruling that Plaintiff' was required to specifically allege precisely how the Diocese Defendants "knew or should have known" that Sepulveda posed such a danger would constitute a heightened pleading requirement that finds no recognition in the caselaw of our appellate courts.
Adjudication of Plaintiff's negligent supervision claim does not require a civil court to determine issues such as (1) whether Sepulveda should have ever been incardinated; (2) whether he should have been allowed to remain a priest; or (3) whether his relationship with the Diocese should have been severed. All of these questions are inextricably bound up with church doctrine and cannot be decided by a civil court consistent with First Amendment principles. Instead, the issue to be determined in connection with Plaintiff's negligent supervision claim is a purely secular one. Neutral principles of law govern this inquiry and, for this reason, subject matter jurisdiction exists in the trial court over this claim.[7]
*40 *56 2. Negligent Failure to Require Sepulveda to Undergo STD Testing
Plaintiff also asserts a negligence claim against the Diocese Defendants based on their failure to compel Sepulveda to undergo STD testing. In support of this claim, Plaintiff alleged that when he requested that the Diocese Defendants "require Sepulveda to submit to a test for sexually transmitted diseases and inform the Plaintiff of the results so he could be assured of his health, the Bishop and the Diocese refused to require that Sepulveda do so, even though each has the authority to do so." Plaintiff further asserted in his complaint that the Diocese Defendants had sufficient authority over Sepulveda to compel such testing because Bishop Burbidge "holds all executive, judicial, and legislative authority within the Diocese, and holds specifically from Sepulveda a duty of obedience to the Bishop."
In contrast to Plaintiff's claim for negligent supervision, adjudication of this claim would, by definition, require the examination of church doctrine and thus constitute "precisely the type of ecclesiastical inquiry courts are forbidden to make." Harris, 361 N.C. at 273, 643 S.E.2d at 571. As our Supreme Court explained in Harris, a civil court is constitutionally prohibited from "interpos[ing] its judgment" on the proper role of church leaders and the scope of their authority "[b]ecause a church's religious doctrine and practice affect its understanding of each of these concepts." Id.
Rather than existing as a claim that can be decided based on neutral principles unrelated to religious doctrine, this theory of liability is premised on the tenets of the Catholic church-namely, the degree of control existing in the relationship between a bishop and a priest. This claim seeks to impose liability based on the Diocese Defendants' alleged failure to exercise their authority over a priest stemming from an oath of obedience taken by him pursuant to the church's canon law. As such, this claim directly "challenges church actions involving religious doctrine and practice" and cannot be adjudicated without entangling a secular court in ecclesiastical matters. Id. at 275, 643 S.E.2d at 572. The trial court therefore erred in denying the Diocese Defendants' motion to dismiss as to this claim. See id. ("[W]hen a party challenges church actions involving religious doctrine and practice, court intervention is constitutionally forbidden.").
C. NIED Claims
Plaintiff's complaint also contains claims alleging that the Diocese Defendants negligently inflicted emotional distress on Plaintiff by *57 (1) failing to protect him from Sepulveda; and (2) failing to require Sepulveda to undergo STD testing.
To properly set out a claim for NIED, "a plaintiff must allege that (1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress (often referred to as 'mental anguish'), and (3) the conduct did in fact cause the plaintiff severe emotional distress." Johnson v. Ruark Obstetrics and Gynecology Assocs., P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990). Because NIED claims are premised upon negligent conduct by the defendants, a determination that the underlying negligence claim is subject to dismissal will result in the dismissal of the corresponding NIED claim as well. See Thomas v. Weddle, 167 N.C.App. 283, 290, 605 S.E.2d 244, 249 (2004) ("A claim for negligent infliction of emotional distress ... depends upon evidence that the defendants acted negligently. Thus, this claim fails for the same reasons as plaintiffs' other negligence claims." (internal citation omitted)).
*41 1. NIED Based on Negligent Supervision
As explained above, the issue of whether the Diocese Defendants knew or should have known that Sepulveda posed a danger to minors such as Plaintiff because of his sexual attraction to them-the determination central to the adjudication of Plaintiff's negligent supervision claim-can be resolved through the application of neutral principles of law and therefore does not require dismissal under Rule 12(b)(1). Consequently, Plaintiff's NIED claim premised on the assertion that such negligent conduct resulted in him suffering severe emotional distress and that it was reasonably foreseeable that the Diocese Defendants' conduct would result in such distress is likewise permissible under the First Amendment. Because a determination of whether Plaintiff has successfully established the elements of NIED based on the Diocese Defendants' negligent supervision of Sepulveda will not entangle the court in ecclesiastical inquires, subject matter jurisdiction exists in the trial court as to this claim.
2. NIED Based on Failure to Require Sepulveda to Undergo STD Testing
As with Plaintiff's underlying negligence claim based on the Diocese Defendants' failure to require Sepulveda to undergo STD testing, Plaintiff's NIED claim based on those same allegations would necessarily require the court to examine and interpret church doctrine governing the relationship between a priest and a bishop in order to adjudicate the claim. Such an inquiry is, once again, constitutionally prohibited, and *58 Plaintiff's NIED claim arising out of the Diocese Defendants' failure to compel Sepulveda to undergo STD testing must therefore be dismissed pursuant to Rule 12(b)(1). See Harris, 361 N.C. at 273, 643 S.E.2d at 571 (explaining that dismissal is required when "no neutral principles of law exist to resolve ... claims" so that court can "avoid [ ] becoming impermissibly entangled in the dispute").
Conclusion
For the reasons stated above, we affirm in part and reverse in part the trial court's 2 June 2014 order. Plaintiff's claims for negligent supervision and NIED based upon the Diocese Defendants' allegedly negligent supervision of Sepulveda may be resolved through the application of neutral principles of law and, therefore, are not barred by the First Amendment. Plaintiff's claims for negligence and NIED based on the Diocese Defendants' failure to compel Sepulveda to undergo STD testing, conversely, would entangle the court in ecclesiastical matters and are dismissed under Rule 12(b)(1).
AFFIRMED IN PART; REVERSED IN PART.
Judges STEELMAN and HUNTER, JR. concur.
Judge STEELMAN concurred in this opinion prior to 30 June 2015.

John Doe 200 is a pseudonym used by Plaintiff to protect his privacy.

Plaintiff is currently an active member of the military and asserts that the applicable limitations period governing his claims was tolled by the federal Servicemembers' Civil Relief Act, 50 U.S.C.A. App. § 526. The timeliness of Plaintiff's claims is not at issue in this appeal.

"In considering a motion to dismiss for lack of subject matter jurisdiction, it is appropriate for the court to consider and weigh matters outside of the pleadings." Tubiolo v. Abundant Life Church, Inc., 167 N.C.App. 324, 327, 605 S.E.2d 161, 163 (2004), appeal dismissed and disc. review denied, 359 N.C. 326, 611 S.E.2d 853, cert. denied, 546 U.S. 819, 126 S.Ct. 350, 163 L.Ed.2d 59 (2005) ; see Cunningham v. Selman, 201 N.C.App. 270, 280, 689 S.E.2d 517, 524 (2009) ("Unlike a Rule 12(b)(6) dismissal, the court need not confine its evaluation of a Rule 12(b)(1) motion to the face of the pleadings, but may review or accept any evidence, such as affidavits, or it may hold an evidentiary hearing." (citation, quotation marks, and brackets omitted)).

Judge Stephens' order did not explicitly state whether his dismissal of the two above-referenced claims was based on Rule 12(b)(1) or Rule 12(b)(6). However, his order stated that the two claims were "without any legal basis and ... therefore dismissed with prejudice," suggesting that these two claims failed to state a valid claim for relief under Rule 12(b)(6). Moreover, his comments contained in the hearing transcript likewise lead to the conclusion that his dismissal of these claims was based on Rule 12(b)(6) rather than Rule 12(b)(1).

In addition to the remaining claims against the Diocese Defendants, all of Plaintiff's claims against Sepulveda are still pending in the trial court. Those claims are not at issue in this appeal.

At oral argument, counsel for the Diocese Defendants referenced our Supreme Court's decisions in Bridges v. Parrish, 366 N.C. 539, 742 S.E.2d 794 (2013), and Stein v. Asheville City Bd. of Educ., 360 N.C. 321, 626 S.E.2d 263 (2006), in contending that the adjudication of this claim would violate the First Amendment. However, neither of those two cases involve a negligent supervision claim against an employer. Nor do they address issues relating to the civil liability of religious entities or otherwise implicate the First Amendment in any respect. Therefore, Bridges and Stein lack relevance to the limited subject matter jurisdiction issue raised in this appeal.

Plaintiff's complaint also includes an allegation that "[w]hen he was incardinated, Sepulveda was inadequately screened for the positions he would later be given by the Bishop." The Diocese Defendants contend that this allegation is indicative of a claim for negligent hiring-a cause of action this Court has previously rejected as constitutionally prohibited. See Privette, 128 N.C.App. at 495, 495 S.E.2d at 398 ("[T]he decision to hire ... a minister is inextricable from religious doctrine and protected by the First Amendment from judicial inquiry."). At oral argument, Plaintiff acknowledged that this allegation was not intended as a negligent hiring claim against the Diocese Defendants. For the sake of clarity, we hold that Plaintiff is not permitted to proceed on any claim that the Diocese Defendants were negligent in hiring Sepulveda as such a claim would clearly be forbidden by the First Amendment. The Diocese Defendants also raise entanglement concerns as to the allegation in the complaint that Bishop Burbidge "was grossly negligent in having insufficient guidelines in effect within the Diocese to define the proper boundaries between priests of the Diocese and its parishioners." We agree that the First Amendment would not permit a civil court to dictate the content of guidelines issued by the Diocese that relate to ecclesiastical matters. But such an intrusion on First Amendment principles does not exist where, as here, a court is simply asked to adjudicate a claim that a church knew or should have been aware that one particular cleric posed a danger to a plaintiff based on his sexual interest in children.