IN THE SUPREME COURT OF NORTH CAROLINA

No. 278A23

Filed 31 January 2025

GREGORY COHANE

v.

THE HOME MISSIONERS OF AMERICA d/b/a GLENMARY HOME MISSIONERS, ROMAN CATHOLIC DIOCESE OF CHARLOTTE, NC, and AL BEHM

On discretionary review pursuant to N.C.G.S. § 7A-31 of the decision of a divided panel of the Court of Appeals, 290 N.C. App. 378 (2023), reversing an order entered on 27 October 2021 by Judge Daniel Kuehnert in Superior Court, Mecklenburg County, and remanding the case. Heard in the Supreme Court on 18 September 2024.

*White & Stradley, PLLC, by J. David Stradley and Leto Copeley, for plaintiff-appellee.*

*Troutman Pepper Hamilton Sanders LLP, by Joshua D. Davey and Mary K. Grob, for defendant-appellant Roman Catholic Diocese of Charlotte, NC; and Steven B. Epstein for defendant-appellant the Home Missioners of America d/b/a Glenmary Home Missioners.*

*Sam McGee for CHILD USA, amicus curiae.*

*Jeff Jackson, Attorney General, by Ryan Y. Park, Solicitor General, Nicholas S. Brod, Deputy Solicitor General, and Orlando L. Rodriguez, Special Deputy Attorney General, for the State of North Carolina, amicus curiae.*

*Nelson Mullins Riley & Scarborough, LLP, by Lorin J. Lapidus, G. Gray Wilson, Denise M. Gunter, and D. Martin Warf; and Bell, Davis & Pitt, P.A., by Kevin G. Williams, for Young Men's Christian Association of Northwest North Carolina d/b/a Kernersville Family YMCA, amicus curiae.*

EARLS, Justice.

This is a companion case to *McKinney v. Goins*, No. 109PA22-2 (N.C. Jan. 31, 2024), also announced today. There, we held that the revival provision of the SAFE Child Act facially comports with the North Carolina Constitution. Here, we again address the revival provision. The issue before us is whether section 4.2(b) of the SAFE Child Act, which "revives any civil action for child sexual abuse otherwise time-barred" by the three-year statute of limitations, resuscitates claims against direct abusers as well as those who allegedly enabled the abuse. We hold that it does.

One background feature of North Carolina tort law is that a plaintiff can be made whole by recovering from the individual who directly harmed them as well as those who specially contributed to the harm. For example, a plaintiff hurt by a negligent truck driver can sue the truck driver directly, as well as the company who employed, supervised, or hired that person with knowledge of their negligent driving practices. A second background feature is that North Carolina has not recognized a distinct "child sexual abuse" tort. Instead, child sexual abuse victims may bring civil actions under traditional common law torts, such as assault or battery. That means that traditional tort principles apply to common law actions to recover for child sexual abuse.

Against this backdrop, the unanimous SAFE Child Act opened a window for adults who experienced sexual abuse as children to recover for that abuse under tort

law, even if the statute of limitations on their claims had since passed. *See* An Act to Protect Children From Sexual Abuse and to Strengthen and Modernize Sexual Assault Laws (SAFE Child Act), S.L. 2019-245, § 4.2(b), 2019 N.C. Sess. Laws 1231, 1235. That narrow window provided that, for two years only, "this section revives any civil action for child sexual abuse otherwise time-barred under G.S. 1-52." *Id.* In turn, N.C.G.S. § 1-52 is the three-year statute of limitations that applies to negligence and other types of personal injury torts. *See Misenheimer v. Burris*, 360 N.C. 620, 625 (2006) (noting that common law negligence actions are limited by N.C.G.S. § 1-52).

The issue here is whether the General Assembly meant to distinguish between abusers who personally harmed the plaintiff and those organizations, institutions, and parties that employed or supervised the abuser or otherwise condoned, ratified, or facilitated the abuse (enablers). Defendants would have us hold not only that the revival provision distinguished between the two types of potential defendants but also that it authorized suits against abusers and *not* against enablers, in contravention of background tort law principles. We conclude that such a distinction does not follow from the plain text of the provision, nor does it find support in the SAFE Child Act or related statutory provisions read as a whole.

Because the revival of "any civil action for child sexual abuse otherwise time-barred under G.S. 1-52" really means *any* such action, consistent with applicable tort law principles, we hold that claims against abusers and enablers are equally revived. The decision of the Court of Appeals is affirmed.

## I.    Background

### A.  The SAFE Child Act

The SAFE Child Act was passed unanimously by the General Assembly and signed into law by the Governor. Its purpose according to its title was to "protect children from sexual abuse and to strengthen and modernize sexual assault laws." 2019 N.C. Sess. Laws at 1231.

Part IV of the Act made a number of changes extending civil statutes of limitations. For example, the Act extended the time period by which a plaintiff could file a civil action "for claims related to sexual abuse" that occurred while that person was a minor. *Id.* § 4.1, 2019 N.C. Sess. Laws at 1234. Ordinarily, when a minor experiences a personal injury, the statute of limitations for their civil action tolls until they turn eighteen years old. *See* N.C.G.S. § 1-17(a) (2023). Section 4.1 of the Act extended that tolling period for claims "related to sexual abuse" that occurred while the person was a minor until that person turns twenty-eight years old, giving a prospective plaintiff many more years to bring such suits. *See* SAFE Child Act § 4.1, 2019 N.C. Sess. Laws at 1234.

The Act also granted plaintiffs of all ages a second bite at the civil liability apple where the underlying abuse results in a new criminal conviction: "[A] plaintiff may file a civil action within two years of the date of a criminal conviction for a related felony sexual offense against a defendant for claims related to sexual abuse suffered while the plaintiff was under 18 years of age." *Id.* § 4.2(a), 2019 N.C. Sess. Laws at

1235. The Act further clarified that the statutes of limitations for assault, battery, false imprisonment, and other personal injury tort claims under N.C.G.S. § 1-52(5), (16), and (19) are curtailed to the extent they conflict with those two new sections. *Id.*

In addition to those forward-looking changes extending the statutes of limitation, the Act also offered one backward-looking change. It resurrected already time-barred civil claims if they were brought in a narrow period of time:

> Effective from January 1, 2020, until December 31, 2021, this section revives any civil action for child sexual abuse otherwise time-barred under G.S. 1-52 as it existed immediately before the enactment of this act.

*Id.* § 4.2(b), 2019 N.C. Sess. Laws at 1235.[1] This so-called "revival provision" gave new life to plaintiff Gregory Cohane's claims for injury.

## B. Mr. Cohane's Civil Action

Mr. Cohane makes the following allegations in his complaint, which we accept as true for the purposes of reviewing the Rule 12(b)(6) motions to dismiss filed by Home Missioners of America (Glenmary) and the Roman Catholic Diocese of Charlotte, NC (Diocese). *See State ex rel. Stein v. Kinston Charter Acad.*, 379 N.C. 560, 572 (2021) (noting that at the Rule 12(b)(6) review stage, we view the allegations in a complaint as true and admitted and ask whether they "are sufficient to state a claim upon which relief can be granted under some legal theory" (quoting *Bridges v.*

---

[1] This temporary provision was never published in the General Statutes, so we reference the session law throughout. *See Custom Molders, Inc. v. Am. Yard Prods., Inc.*, 342 N.C. 133, 137 (1995) (noting that statements in session laws control over codified statements in the General Statutes if there is a conflict).

*Parrish*, 366 N.C. 539, 541 (2013))).

Al Behm was a clergyman in the Roman Catholic order run by defendant Glenmary. Mr. Behm first crossed paths with Mr. Cohane in 1972 at the latter's family home, while the former was an ordained Catholic brother working at the Glenmary Youth Center in Connecticut. Mr. Cohane was nine years old at the time.

Mr. Behm "began grooming" Mr. Cohane at a very early age. Mr. Behm regularly visited Mr. Cohane at his home and later invited Mr. Cohane for overnight stays and overnight trips. Mr. Cohane's parents approved, because they saw the growing relationship "as healthy and positive" and because they trusted Mr. Behm as a clergyman and community member. But during these visits, Mr. Behm began to ask Mr. Cohane for back massages, during which Mr. Behm wore increasingly little clothing, and would tell Mr. Cohane he loved him. Mr. Behm "established himself as the closest loving, kind and supportive adult presence" in Mr. Cohane's life, a stark contrast to his "emotionally and verbally abusive" parents.

While under Glenmary's employ, Mr. Behm's relationship with Mr. Cohane continued for years, eventually turning into a sexually abusive one. During the grooming period, Glenmary reassigned Mr. Behm to a parish in Kentucky. Even still, Mr. Behm maintained his relationship with Mr. Cohane through mail and phone calls. In Kentucky, Mr. Behm was accused of molesting another child. Rather than report the credible allegations of abuse to authorities, Glenmary continued transferring Mr. Behm to other parishes: next to Cincinnati, Ohio. Glenmary later

arranged and paid for Mr. Behm to pursue graduate studies in human sexuality in California. Mr. Cohane's parents, ignorant of the child molestation allegations against Mr. Behm, allowed their son to visit him in California. During that visit, Mr. Behm "behaved toward [Mr. Cohane] in a sexually intimate manner." Mr. Cohane was fifteen years old.

After Mr. Behm completed his studies, Glenmary and Diocese assigned him to a new position—campus Catholic clergy at Western Carolina University (WCU). "In this position, Behm would be in charge of ministering to the spiritual needs of all Catholic students and clergy at WCU, and would be in charge of running the Catholic Student Center and supervising its staff, which was provided by Defendant Diocese." Neither Diocese nor Glenmary ever reported Mr. Behm's string of sexual abuse allegations to WCU. While serving as campus clergy, Mr. Behm had regular, inappropriately intimate calls with Mr. Cohane, who was then in high school. Mr. Behm again invited Mr. Cohane for long visits, which his parents consented to because of their trust in Mr. Bhem, during which Mr. Behm took advantage of Mr. Cohane's trust in him to convince him to engage in sexual acts. Mr. Behm eventually convinced Mr. Cohane to attend WCU and intervened to secure Mr. Cohane's admission to the school. Once Mr. Cohane enrolled as a WCU student, Mr. Behm continued and escalated the sexual abuse. Mr. Behm also introduced Mr. Cohane to drugs and alcohol, exacerbating Mr. Cohane's mental health spiral.

Meanwhile, Glenmary directed Mr. Behm to travel and meet with other

clergymen accused of child sexual abuse—a so-called "support group" for the Glenmary clergy. That measure proved futile. In 1984, after receiving reports of sexual misconduct by Mr. Behm at WCU, Glenmary yet again transferred him, this time to Tennessee. The allegations continued during Mr. Behm's time in Tennessee, as he was—once again—accused of child sexual abuse. Still, Glenmary did not alert authorities or fire Mr. Behm—and it was not until 2019 that Diocese or Glenmary publicly admitted that Mr. Behm had been repeatedly, credibly accused of child sexual abuse while in their employ.

Mr. Cohane turned eighteen in 1981, which started the clock on the three-year statute of limitations for personal-injury torts. He did not sue before that window closed in 1984. Instead, he brought suit in July 2021, at age fifty-seven—invoking the revival provision of the SAFE Child Act to do so. His complaint sought relief for harms caused by battery, assault, negligent infliction of emotional distress, and intentional infliction of emotional distress by Mr. Behm, as well as negligence and negligent assignment, supervision, and retention by Diocese and Glenmary.

## C. Opinions Below

Defendants Diocese and Glenmary moved to dismiss Mr. Cohane's suit, contending that his claims were time-barred and outside the scope of section 4.2(b). The trial court agreed and granted defendants' motions. In the court's view, section 4.2(b) only revived claims against a direct perpetrator of child sexual abuse. It contrasted section 4.2(b) with other parts of the SAFE Child Act. Though section

4.2(b) revived "any civil action for child sexual abuse," neighboring provisions like section 4.1 extended "claims related to sexual abuse." SAFE Child Act §§ 4.1, 4.2(b), 2019 N.C. Sess. Laws at 1234–35. That different phrasing—"related to" versus "for"—suggested that "for" in section 4.2(b) was "narrow and limited to claims against alleged perpetrators of child sexual abuse." Since Glenmary and Diocese did not directly abuse Mr. Cohane, the revival provision did not apply to Mr. Cohane's claims against them. Thus, the court dismissed the claims against both institutional defendants as time-barred.

Mr. Cohane appealed, and the Court of Appeals reversed the trial court's order. It emphasized first the role of plain language in statutory interpretation. When a statute "is clear and unambiguous, . . . [its] words are applied in their normal and usual meaning." *Cohane v. Home Missioners of Am.*, 290 N.C. App. 378, 381 (2023) (quoting *Misenheimer*, 260 N.C. at 623). According to the Court of Appeals, the plain language of section 4.2(b) is intentionally broad, according to the "any" modifier. *Id.* at 383. "Had the legislature intended to limit the revival provision to torts by the perpetrator," the court reasoned, "the legislature could have specified the subsections within section 1-52" that it meant to tie the revival provision to. *Id.* It did not so specify. And since Mr. Cohane's claims against Glenmary and Diocese meet the statutory criteria—they were timely filed, "for" child sexual abuse, and otherwise time-barred by section 1-52—the Court of Appeals held that section 4.2(b) revived them. *Id.* We allowed defendants' petition for discretionary review.

## II. Analysis

### A. Legal Principles

This matter comes to us on review of the Court of Appeals' decision reversing the trial court's order granting Diocese and Glenmary's motions to dismiss under Rule 12(b)(6). To determine whether a Rule 12(b)(6) motion was properly granted, "this Court examines 'whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory.' " *State ex rel. Stein*, 379 N.C. at 572 (quoting *Bridges*, 366 N.C. at 541). Statutory interpretation is reviewed de novo because it presents a question of law. *In re Foreclosure of Vogler Realty, Inc.*, 365 N.C. 389, 392 (2012).

"When called to interpret a statute, legislative intent is the guiding star." *Fearrington v. City of Greenville*, 386 N.C. 38, 52 (cleaned up), *reh'g denied*, 902 S.E.2d 737 (mem.) (2024). "We first look to the plain language, as the actual words of the legislature are the clearest manifestation of its intent." *Id.* (cleaned up). Our "primary task is to determine legislative intent while giving the language of the statute its natural and ordinary meaning unless the context requires otherwise." *Spruill v. Lake Phelps Volunteer Fire Dep't, Inc.*, 351 N.C. 318, 320 (2000) (quoting *Turlington v. McLeod*, 323 N.C. 591, 594 (1988)); *see also Wilkie v. City of Boiling Spring Lakes*, 370 N.C. 540, 550 (2018) (noting that when the legislature has not supplied a definition, we generally give a term its ordinary meaning). Accordingly, words and phrases are interpreted in their statutory context, *In re Hardy*, 294 N.C.

90, 95–96 (1978), and traditional rules of grammar apply, *Smith Chapel Baptist Church v. City of Durham*, 350 N.C. 805, 811 (1999). Where the statute's language is clear and unambiguous, courts must construe it using its plain meaning. *State v. Borum*, 384 N.C. 118, 124 (2023).

**B. Application**

    With these principles in mind, we start our inquiry with the plain language of the revival provision. Section 4.2(b) first narrows its operation to a specific window of time: "Effective from January 1, 2020, until December 31, 2021 . . . ." SAFE Child Act § 4.2(b), 2019 N.C. Sess. Laws at 1235. Within that circumscribed temporal window, "this section revives any civil action." *Id.* The modifier "any" before "civil action" indicates that the statute sweeps broadly and encompasses a range of claims. *See Any*, Webster's Third New International Dictionary 97 (2002) (defining the "any" adjective as "one, no matter what one" synonymous with "every" and "used as a function word esp[ecially] in assertions and denials to indicate one that is selected without restriction or limitation of choice" for example, "[any] child would know that"); *e.g.*, *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 9–10 (2011) (noting that "any" suggests a broad sweep in the statutory phrase "filed any complaint").

    The provision then narrows that broad sweep with a final modifier clause: "[F]or child sexual abuse otherwise time-barred under G.S. 1-52 as it existed immediately before the enactment of this act." SAFE Child Act § 4.2(b), 2019 N.C.

Sess. Laws at 1235. By referencing N.C.G.S. § 1-52, the provision keys its operation to a specific universe of claims: those covered by the three-year statute of limitations provision. That includes "assault, battery, or false imprisonment," N.C.G.S. § 1-52(19) (2017), claims for "any other injury to the person or rights of another, not arising on contract," *id.* § 1-52(5), and claims for "personal injury," *id.* § 1-52(16). It also includes actions for negligence. *Wilson v. McLeod Oil Co.*, 327 N.C. 491, 507 (1990) (observing that N.C.G.S. § 1-52(5) captures common law negligence). The revival provision is not limited to any one of those types of claims, as "child sexual abuse" is not a specific subsection in N.C.G.S. § 1-52.

Thus, when section 4.2(b) revives actions "for child sexual abuse" otherwise barred by N.C.G.S. § 1-52—and *any* such actions at that—it necessarily contemplates the array of traditional tort actions under which a plaintiff could recover for harms or injuries stemming from child sexual abuse, so long as they would be time-barred by the three-year limitations period. "For" is the function word making that connection clear. *See For*, Webster's Third New International Dictionary 886 (indicating that "for" is a function word showing the object of something, or is synonymous with "concerning").

Importantly, nothing in the revival provision's language draws distinctions based on the defendant's identity in such an action. Quite the opposite. The claims covered by N.C.G.S. § 1-52, including claims for negligence and addressing personal injuries, traditionally can be brought against direct abusers and enablers. *E.g.*, *Doe*

*v. Diocese of Raleigh*, 242 N.C. App. 42, 43–44 (2015) (action for negligence against an employer based on sexual abuse committed by an employee). The General Assembly presumably knew that such actions occurred under existing law and intended to revive them, too, by referencing their corresponding statute of limitations provision. *See C Invs. 2, LLC v. Auger*, 383 N.C. 1, 13 (2022) ("The Legislature is presumed to know the existing law and to legislate with reference to it." (quoting *State v. S. Ry. Co.*, 145 N.C. 495, 542 (1907))).

The upshot from the plain language of the provision, considering its text and context, is it revives civil actions for child sexual abuse, whatever their kind or category, so long as they are brought within the requisite time period (2020 to 2021), seek recovery for the targeted harm (for child sexual abuse), and are an action otherwise time-barred by N.C.G.S. § 1-52 before enactment of the SAFE Child Act (those actions falling within the statutory limitation of three years).

Diocese and Glenmary have a contextual argument in response. Other parts of the SAFE Child Act expand the statute of limitations for claims "related to sexual abuse while the plaintiff was under 18 years of age," while the revival provision references claims "for child sexual abuse." "Related to" and "for" are different words, they argue, and must thus have different meanings. And that different meaning must be that claims "for" child sexual abuse reach only abusers, while claims "related to" child sexual abuse reach enabling behavior like negligent supervision, too.

That argument is unavailing for at least three reasons. First, although "for" and "related to" might be materially different in some contexts, they appear to be materially similar in this one. As explained above, "for" in the revival provision is a function word—it shows the subject of the civil actions addressed by the provision. The "related to" language in section 4.1's prospective extension of the statute of limitations is also a function phrase showing the subject of the targeted claims. *See* SAFE Child Act § 4.1, 2019 N.C. Sess. Laws at 1234 (covering "a civil action against a defendant for claims *related to* sexual abuse" (emphasis added)); *id.* (covering "a civil action . . . for a related felony sexual offense against a defendant for claims *related to* sexual abuse" (emphasis added)). That functional similarity cuts against ascribing different meaning to these words under the presumption of consistent usage. That presumption only comes into play when a statute "has used one term in one place, and a *materially different* term in another," which does not occur when two different terms are effectively synonyms in context. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) (emphasis added).

Second, even if we assume that "related to" and "for" are purposely, materially different, defendants' subsequent logical step still falters. It does not follow that a claim "for" a certain harm in a statute of limitations provision somehow excludes theories of liability. For example, the three-year limitations statute referenced in the revival provision often uses "for" when identifying the cause of action to which the

limitation applies. *E.g.*, N.C.G.S. § 1-52(4) (2023) ("For taking, detaining, converting or injuring any goods or chattels . . . ."); *id.* § 1-52(5) ("[F]or any other injury to the person or rights of another, not arising on contract and not hereafter enumerated . . . ."). Yet such actions threaten liability for direct tortfeasors as well as contributing institutions and organizations, for example, through theories of vicarious liability. *E.g.*, *White v. Consol. Plan., Inc.*, 166 N.C. App. 283, 292–95, 305 (2004) (applying the statute of limitations in N.C.G.S. § 1-52 for conversion, negligence, and fraud to claims against a vicariously liable organizational defendant).

Defendants' contrary reading does not make sense, because statutes of limitations and theories of tort liability are different. The former operates against the backdrop of the longstanding common law of torts that aims to "make whole the injury or harm victims" by allowing recovery both from direct tortfeasors and from others who contributed to the harm. *See* 1 Am. L. of Torts § 4:1 (2021). At common law, a person or entity can be liable for "torts actually and physically committed, or omitted, by another [based] on two grounds—or on a combination of these two grounds." *Id.* The first is direct liability for imputed tortious conduct, for example, negligent "selection, retention, control, or supervision of the actual wrongdoer." *Id.* The second is vicarious liability typically based on theories of agency like ratification, respondeat superior, etc. *Id.* We presume the legislature knows these tort law principles and legislates with them in mind. *See C Invs. 2, LLC*, 383 N.C. at 13; *cf.*

*Wise v. Harrington Grove Cmty. Ass'n, Inc.*, 357 N.C. 396, 401 (2003) ("Statutes in derogation of the common law should be strictly construed." (cleaned up)).

At bottom, defendants' reading of the statute contradicts basic principles of tort law and long-held interpretations of the relevant statutes of limitation. Nothing in the statute's plain language, not even the subtle word "for," suggests the legislature intended to treat torts seeking recovery for child sexual abuse differently from traditional torts by limiting liability for possible defendants under the revival provision.

Third, we have good reason to conclude that if the legislature did intend to distinguish between types of defendants and only revive actions against some of them, it would have said so explicitly. Where the identity of the defendant matters for the relevant statute of limitations, the General Assembly explicitly says so. *E.g.*, N.C.G.S. § 1-52(6) ("Against the sureties of any executor, administrator, collector or guardian on the official bond of their principal . . . ."); *id.* § 1-52(13) ("Against a public officer, for a trespass, under color of his office."). Moreover, other parts of the SAFE Child Act do limit liability for "person[s]." *See* SAFE Child Act § 1(a), 2019 N.C. Sess. Laws at 1232 (amending the scheme for the duty to report crimes against juveniles by granting "good-faith immunity" to a "person" who makes a qualifying report). That there is no "person" limitation in the revival provision further confirms that the General Assembly did not intend to limit that provision's operation based on the defendant's identity. *Cf. H.B. v. M.J.*, 508 P.3d 368, 377 (Kan. 2022) (contrasting

"perpetrator-based language" in other states' revival statutes with "harm-based language" in Kansas's statute, which uses language similar to North Carolina's).

In sum, Glenmary and Diocese's reading of the revival provision is unpersuasive. The provision clearly and unambiguously revives Mr. Cohane's claims for child sexual abuse otherwise time-barred against any tortfeasors, including both institutional defendants alleged here to be responsible for the abuse he suffered.

Finally, we need not reach Glenmary and Diocese's constitutional avoidance argument. Such a consideration only comes into play when a statute has two reasonable constructions. *Delconte v. State*, 313 N.C. 384, 402 (1985). Here, for the reasons explained above, the statute has only one reasonable interpretation, which poses no constitutional problem. *See McKinney*, slip op. at 2–3.

### III. Conclusion

The text and context of section 4.2(b) of the SAFE Child Act confirm that the temporary revival provision authorizes claims against alleged sexual abusers of children and their enablers alike. We hold that Mr. Cohane's claims against Diocese and Glenmary are not barred by the statute of limitations in N.C.G.S. § 1-52, pursuant to section 4.2(b) of the Act. The decision of the Court of Appeals is affirmed.

AFFIRMED.

Justice RIGGS did not participate in the consideration or decision of this case.