**Affirmed and Opinion Filed August 11, 2021**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

### No. 05-19-00997-CV
_____

### JOHN DOE, Appellant
### V.
### ROMAN CATHOLIC DIOCESE OF DALLAS, Appellee

**On Appeal from the 95th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-18-07025**

## MEMORANDUM OPINION

Before Justices Pedersen, III, and Reichek[1]
Opinion by Justice Pedersen, III

Appellant John Doe brought suit against appellee Roman Catholic Diocese of

Dallas ("Dallas Diocese"), alleging the Dallas Diocese committed fraud by not

following its internal policies for responding to sexual abuse after he reported he

was sexually abused by a Dallas Diocese priest.[2] The district court dismissed the

case for lack of jurisdiction, citing the ecclesiastical abstention doctrine, also known

---

[1] The Honorable Bill Whitehill was on the panel and participated at the submission of this case. Due to the expiration of his term on December 31, 2020, he did not participate in the issuance of this opinion. *See* TEX. R. APP. P. 41.1(a), (b).

[2] Doe's petition contained no other independent cause of action but included respondeat superior, a derivative theory of liability. Doe did not allege sexual abuse, assault, battery, or negligence claims against the Dallas Diocese.

as the religious autonomy doctrine.[3] The district court determined that (i) the Dallas Diocese's Sexual Misconduct Policy (Policy) was "an outgrowth of, or so integrally related to, the Dallas Diocese's dogma that it comprises part of the Dallas Diocese's religious representations, beliefs, and teachings," (ii) Doe's fraud claim required Doe to prove the Dallas Diocese's material representations to Doe were false, and (iii) the First Amendment to the Constitution of the United States prohibited the trial court from adjudicating the truth or falsity of religious doctrines or beliefs. Because Doe's claims require resolution of matters of church government, we affirm the judgment of the trial court.

## I.     BACKGROUND

### A. Sexual Misconduct Policy

The Dallas Diocese is a religious organization that promotes the exercise of Christianity under the Roman Catholic denomination. The Dallas Diocese developed and promulgated a Policy, which describes how it responds to sexual misconduct and how it intends to treat the victims of sexual misconduct. The Policy provides:

> The Diocese will act in accord with the principles of truth, honesty, and justice, while respecting confidentiality, privacy and the reputation of persons involved.
> . . .
> All Diocesan and Parochial Personnel who suspect, witness, or otherwise become aware of any incident of sexual misconduct

---

[3] *See, e.g.*, *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346, 347 (5th Cir. 2020).

involving Diocesan or Parochial Personnel must immediately report such information to the Chancellor.[4]

. . .

Upon receipt of a complaint of sexual misconduct, the Chancellor will notify the Bishop and assist him with the manner in which to proceed, including the undertaking of an investigation.

. . .

When all of the evidence has been collected and the investigation is complete, the Chancellor will report all material facts and findings to the Bishop. The Bishop, together with the Review Board,[5] will determine whether the alleged conduct is an act of abuse of a minor or vulnerable adult.

. . .

If the Bishop determines at any time there is sufficient evidence that sexual abuse of a minor or vulnerable adult by a priest or deacon has occurred, the Bishop will promptly transmit the complaint and the findings of the investigation to the Congregation for the Doctrine of the Faith.[6]

. . .

The Bishop and all Diocesan and Parochial Personnel charged with implementing this policy will be as open as possible with the people in our parish and community about instances of sexual abuse of minors and vulnerable adults, with respect always for the privacy and the reputation of the individuals involved.

. . .

---

[4] Merriam Webster defines "chancellor" as "a Roman Catholic priest heading the office in which diocesan business is transacted and recorded." *Chancellor*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/chancellor (last visited July 1, 2021).

[5] The record indicates the Review Board is "a confidential consultative body that will advise and assist the Bishop as he administers these policies" with "no fewer than five persons of outstanding integrity and good judgment in full communion with the Church to serve on this Board" and a majority to consist "of lay persons not in the employ of the diocese." The record further indicates "[a]t least one member will be a priest who is an experienced and respected pastor of the diocese. At least one member will have particular expertise in the treatment of the sexual abuse of minors."

[6] The record contains no definition for "Congregation for the Doctrine of the Faith." We provide the following citation solely as obiter dictum:

> The Congregation for the Doctrine of the Faith is the oldest among the nine congregations of the Roman Curia, seated at the Palace of the Holy Office in Rome. It was founded to defend the church from heresy; today, it is the body responsible for promulgating and defending Catholic doctrine.

*Wikipedia: Congregation for the Doctrine of the Faith*, https://en.wikipedia.org/wiki/Congregation_for_the_Doctrine_of_the_Faith (last visited Aug. 5, 2021).

Care will always be taken to respect and protect the rights of all parties involved, particularly those of the persons claiming to have been sexually abused or harassed and of the person against whom the charge has been made.

## B. Report of Sexual Misconduct

Before Doe sued, he reported to a Dallas Diocese priest multiple experiences of sexual abuse that he suffered at the hands of Father Timothy Heines. The priest reported Doe's statements to the Dallas Diocese's then-Monsignor[7] Greg Kelly and Chancellor Mary Edlund. In September 2015, Doe met with Kelly and Edlund, and he discussed "being sexually assaulted by Heines in 2008 and the hot oil massages Heines performed on [him] in the church rectory while [he] was in high school." Doe further showed the Dallas Diocese "shirtless photographs that [Heines] had taken of him in the church rectory while [he] was in middle school and high school." The Dallas Diocese performed an internal investigation of Heines, which ultimately resulted in Heines's October 8, 2015 resignation from the ministry in the Dallas Diocese.

---

[7] Merriam Webster defines "monsignor" as "a Roman Catholic prelate having a dignity or titular distinction (as of domestic prelate or protonotary apostolic) usually conferred by the pope —used as a title prefixed to the surname or to the given name and surname." *Monsignor*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/monsignor. (last visited July 1, 2021). Merriam Webster defines "prelate" as "an ecclesiastic (such as a bishop or abbot) of superior rank." *Prelate*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/prelate (last visited July 1, 2021).

## C. Allegation of Fraud

The weekend following Heines's resignation, the Dallas Diocese issued a letter to the parishioners at St. Joseph Catholic Church in Richardson, Texas, where Heines previously served as pastor. The letter read:

> I write to you today out of pastoral concern about a difficult matter related to your Pastor, Father Timothy Heines.
>
> I recently received a complaint about his involvement in serious boundary violations with adults. These incidents occurred in 1996 and 2008 prior to his assignment at St. Joseph. We have not received information regarding any incident here in the parish. I emphasize that this involved inappropriate relationships with adults.

Thereafter, the Dallas Diocese did not transmit the investigation to the Review Board to determine whether Doe's allegation of sexual abuse involved a minor or vulnerable adult until several months later.

On May 30, 2018, Doe filed a suit for fraud[8] against the Dallas Diocese. Doe alleged five material misrepresentations regarding the Dallas Diocese's implementation of the Policy, involving (i) the investigation and reporting of his claims and (ii) the way it communicated with the community about Heines:

> a. The Dallas Diocese did not act in accord with principles of truth, honesty, and justice in investigating John Doe's claim of sexual abuse.

---

[8] The Texas Supreme Court has promulgated the elements of a fraud claim as follows:

> To prevail on a fraud claim, a plaintiff must show: (1) the defendant "made a material representation that was false"; (2) the defendant "knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth;" (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result.

*JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018).

Instead, the Dallas Diocese lied to Father Heines'[s] current parish about why Father Heines' was removed from ministry. Bishop Farrell refused to acknowledge the sexual abuse John Doe suffered as a minor;

b. The Dallas Diocese was not open and transparent in communicating with the community about Father Heines'[s] abuse of a minor. Instead, the Dallas Diocese lied to Father Heines'[s] current parish about why Father Heines' was removed from ministry. Bishop Farrell refused to acknowledge the sexual abuse John Doe suffered as a minor;

c. Bishop Farrell did not report John Doe's sexual abuse to the diocesan Review Board;

d. Bishop Farrell and the Dallas Diocese made no effort to determine whether John Doe's sexual abuse constituted sexual abuse of a minor or vulnerable adult; and

e. The Dallas Diocese did not report Father Heines'[s] sexual abuse of John Doe to the Congregation of the Doctrine of Faith.

On February 27, 2019, the Dallas Diocese filed its plea to the jurisdiction, which attached affidavits from Kelly and Edlund. On May 17, 2019, Doe responded to the plea to the jurisdiction, which contained a request for leave of court to amend his petition and attached his own affidavit along with the affidavit of Dallas Police Detective David Clark. Both Doe and the Dallas Diocese raised objections to evidence attached to the other's plea to the jurisdiction filings. The trial court heard the plea to the jurisdiction on May 24, 2019, and entered an order granting the plea to the jurisdiction and overruling all of the parties' objections. This appeal followed.

## II.    ISSUES RAISED

Doe raises a single issue to our Court.

[Whether] [t]he trial court erred in granting the Dallas Diocese's Plea to the Jurisdiction and dismissing all of John Doe's claims with prejudice.[9]

The Dallas Diocese raises a single cross-point on appeal:

Did the trial court abuse its discretion and commit harmful error in overruling the Diocese's objections to Detective Clark's affidavit?

### III. STANDARD OF REVIEW

A plea to the jurisdiction is a dilatory plea, the purpose of which is to defeat a cause of action based on lack of subject-matter jurisdiction without regard to the merits of the claim. *Town of Fairview v. Lawler*, 252 S.W.3d 853, 855–56 (Tex. App.—Dallas 2008, no pet.) (citing *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000)). A trial court's ruling on a plea challenging subject matter jurisdiction is reviewed de novo. *City of Dallas v. Redbird Dev. Corp.*, 143 S.W.3d 375, 380 (Tex. App.—Dallas 2004, no pet.) (citing *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998)). As part of our de novo review, we focus first on the plaintiff's petition to determine whether the pled facts affirmatively demonstrate that subject-matter jurisdiction exists. *In re Episcopal Sch. of Dallas, Inc.*, 556 S.W.3d 347, 352 (Tex. App.—Dallas 2017, no pet.) (citing *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)). We construe the pleadings liberally in the plaintiff's favor. *Id.* (citing *Miranda*, 133 S.W.3d at 226). If a plea to the jurisdiction challenges the existence of jurisdictional facts, the trial court may

---

[9] Doe raised ten "sub-issues," which were derivative of his sole issue.

–7–

consider evidence beyond the pleadings and must do so when necessary to resolve the jurisdictional issues raised. *Id.* (citing *Miranda*, 133 S.W.3d at 226; *Blue*, 34 S.W.3d at 555). The court must grant the plea as a matter of law if there is an incurable jurisdictional defect. *Id.*

## IV.    ECCLESIASTICAL ABSTENTION

The First Amendment to the United States Constitution prohibits Congress from making any "law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. 1. The Fourteenth Amendment further imposes this restriction on the states. *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 441 (1969).[10] "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990)); *see, e.g.*, *Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 135 (5th Cir. 2009). This prohibition on the establishment of religion means the government may not interfere with a religious organization's "ecclesiastical decisions." *Hosanna-Tabor Evangelical Lutheran*

---

[10] The United States Supreme Court provides:

> First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern.

*Mary Elizabeth Blue Hull*, 393 U.S. at 449.

*Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188-89 (2012) ("According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.").[11]

The Texas Supreme Court has recently addressed the ecclesiastical abstention doctrine in *In re Diocese of Lubbock*, 624 S.W.3d 506 (Tex. 2021) (orig. proceeding). *In re Diocese of Lubbock* involved a church deacon who sued the Diocese of Lubbock—alleging defamation and intentional infliction of emotional distress—after the diocese included the deacon on a list that named clergy "against whom credible allegations of sexual abuse of a minor have been raised." 624 S.W.3d at 510. The diocese completed the list after internal investigation and review, which included "'consultation with the Diocesan Review Board or other professionals'" and the diocese's attorney engaging "'the services of a retired law enforcement professional and a private attorney to review all clergy files for any credible allegations of abuse of minors.'" *Id.* The diocese shared the list on its website and commented on the list by a news release. *Id.*

---

[11] Merriam Webster defines "ecclesiastical" as "of or relating to a church especially as an established institution." *Ecclesiastical*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/ecclesiastical (last visited July 1, 2021).

The deacon demanded the diocese retract his name from the list. *Id.*[12] The diocese responded with "a letter explaining that the Bishops from the Texas Dioceses formulated a plan in 2018 to evaluate which of its priests and clergy had been credibly accused of sexual abuse of a minor" and based its definition of a "minor" on canon law. *Id.* at 510–11. After the deacon sued, the diocese moved to dismiss the case (i) under the Texas Citizens Participation Act (TCPA) and (ii) by a plea to the jurisdiction, arguing that the ecclesiastical abstention doctrine precluded jurisdiction. *Id.* at 511. The trial court denied both motions and the Amarillo Court of Appeals denied mandamus relief regarding denial of the diocese's plea to the jurisdiction. *Id.*

The Texas Supreme Court concluded the deacon's "claims relating to the Diocese's publication and communication of the results of its investigation cannot be severed from its policy to investigate its clergy in the first place"—thereby falling within the ecclesiastical abstention doctrine. *Id.* at 509, 518-19. The Texas Supreme Court explained:

> The ecclesiastical abstention doctrine prohibits civil courts from delving into matters of "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." The doctrine is grounded in the First Amendment, which protects the right of religious institutions "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine."

---

[12] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 73.055(a) ("A person may maintain an action for defamation only if: (1) the person has made a timely and sufficient request for a correction, clarification, or retraction from the defendant; or (2) the defendant has made a correction, clarification, or retraction.").

. . . .

Churches have a fundamental right under the First Amendment to decide for themselves, free from state interference, matters of church governance as well as those of faith and doctrine.

*Id.* at 508–09, 513 (internal citations and quotations omitted).

Courts are barred from interfering with a religious group's choices regarding its "internal governance," including its decision "to fire one of its ministers." *Hosanna-Tabor*, 565 U.S. at 181, 188. Courts are barred from hearing "church disputes over church polity and church administration," or claims involving a religious organization's "internal discipline and government." *Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 724–25 (1976).[13] Courts are further barred from deciding whether a church's actions "depart substantially from prior doctrine." *Mary Elizabeth Blue Hull*, 393 U.S. at 450. As the Texas Supreme Court explained:

It is a core tenet of the First Amendment that in resolving civil claims courts must be careful not to intrude upon internal affairs of church governance and autonomy. Autonomy extends to the rights of hierarchical religious bodies to establish their own internal rules and regulations and to create tribunals for adjudicating disputes over religious matters. And it extends to a church's conclusions regarding its own ecclesiastical rules, customs, and laws. Government action that

---

[13] The United States Supreme Court provides:

[T]he First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them.

*Milivojevich*, 426 U.S. at 724-25.

interferes with this autonomy or risks judicial entanglement with a church's conclusions regarding its own rules, customs, or laws is therefore prohibited by the First Amendment.

*In re Diocese of Lubbock*, 624 S.W.3d at 513 (internal citations omitted).

Nevertheless, the First Amendment does not bar all claims against a religious body. *Tilton v. Marshall*, 925 S.W.2d 672, 677 (Tex. 1996). "[S]tates may adopt neutral principles of law as a means of adjudicating such disputes without running afoul of First Amendment concerns, so long as resolution of ownership entails no inquiry into religious doctrine." *Westbrook v. Penley*, 231 S.W.3d 389, 399 (Tex. 2007). "[C]ourts decide non-ecclesiastical issues such as property ownership based on the same neutral principles of law applicable to other entities, while deferring to religious entities' decisions on ecclesiastical and church polity questions." *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 596 (Tex. 2013) (internal citation omitted); *see also Westbrook*, 231 S.W.3d at 399.

## V. DISCUSSION

**Whether the trial court erred in granting the Dallas Diocese's Plea to the Jurisdiction and dismissing all of Doe's claims with prejudice.**

The Dallas Diocese argues that the ecclesiastical abstention doctrine bars Doe's suit because civil court intervention in this dispute would (i) require interpretation of religious laws and principles underlying the Policy and (ii) require adjudication of whether that Policy was properly applied. Doe contends that the ecclesiastical abstention doctrine does not apply because (i) this case does not

–12–

involve a dispute over membership or employment within the religious organization; (ii) the Policy is "not a matter of religious dogma"; (iii) Doe's claims involve a compelling governmental interest; (iv) resolution of the underlying suit is possible through application of neutral principles of law; and (v) a civil resolution is appropriate because the Dallas Diocese interjected the Policy and its efficacy into the public sphere.

Doe concedes this case is about the Dallas Diocese's implementation of its Policy. Doe uses the terms "Minor," "Sexual Abuse," and "Vulnerable Adult" in his petition to allege the Dallas Diocese failed to implement its Policy. The Policy includes the following regarding those pertinent terms:

> Minor
> Any person who has not reached his or her 18th birthday and a person who habitually lacks the use of reason.
>
> Sexual Abuse
> An unlawful form of sexual misconduct, whether it involves a minor or a vulnerable adult.
>
> Sexual abuse of a minor or vulnerable adult includes sexual molestation or sexual exploitation of a minor or vulnerable adult and other behavior by which an adult uses a minor or vulnerable adult as an object of sexual gratification and as defined in Texas civil law. Also included is the acquisition, possession, or distribution by a cleric of pornographic images of minors under the age of fourteen, for purposes of sexual gratification, by whatever means or using whatever technology. The transgressions in question relate to obligations arising from divine commands regarding human sexual interaction as conveyed to us by the Sixth Commandment of the Decalogue. Thus, the norm to be considered in assessing an allegation of sexual abuse of a minor or vulnerable adult is whether conduct or interaction with a minor or vulnerable adult qualifies as an external, objectively grave violation of

the sixth commandment (USCCB, *Canonical Delicts Involving Sexual Misconduct and Dismissal from the Clerical State*, 1995, p.6). A canonical offense against the sixth commandment of the Decalogue (CIC, c. 1395 §2; CCEO, c. 1453 §1) need not be a complete act of intercourse. Nor, to be objectively grave, does an act need to involve force, physical contact, or a discernible harmful outcome. Moreover, "imputability [moral responsibility] for a canonical offense is presumed upon external violation…unless it is otherwise apparent" (CIC, c. 1321 §3; CCEO, c. 1414 §2). Cf. CIC, canons 1322-27, and CCEO, canons 1413, 1415, and 1416.II *Preamble, USCCB, Essential Norms for Diocesan/Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons*.

Ultimately, it is the responsibility of the diocesan Bishop, with the advice of a qualified Review Board, to determine the gravity of the alleged act.

. . . .

Vulnerable Adult
Persons 18 years of age or older who, because of physical, mental, emotional or cognitive impairment, or the effects of recent life experiences are presently unable to exercise a reasonable adult's degree of physical or emotional independence or mental insight and judgment. Vulnerable adults include those who are physically unable to meet their own needs or seek help without assistance, as well as otherwise healthy adults who are vulnerable because of recent life experiences such as those in or recovering from abusive relationships, those grieving the death of a loved one, undergoing treatment for substance abuse, suffering job loss or career difficulties, experiencing separation, divorce, family or marital discord, financial difficulties, or facing sudden illness of those for whom they are responsible.

(emphasis in original).

On application of the ecclesiastical abstention doctrine, the Texas Supreme

Court provides:

courts will analyze whether a particular dispute is ecclesiastical or merely a civil-law controversy in which the church happens to be

involved. *See Tran v. Fiorenza*, 934 S.W.2d 740, 743 (Tex. App.—Houston [1st Dist.] 1996, no writ). In making this determination, we look to the substance and nature of the plaintiff's claims. *See Patton v. Jones*, 212 S.W.3d 541, 548 (Tex. App.—Austin 2006, pet. denied). Because courts are prohibited from risking judicial entanglement with ecclesiastical matters, *see Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049, 2069 (2020), if the substance and nature of the plaintiff's claims are inextricably intertwined with matters of doctrine or church governance, then the case must be dismissed, *Jennison v. Prasifka*, 391 S.W.3d 660, 665, 668 (Tex. App.—Dallas 2013, no pet.).

*In re Diocese of Lubbock*, 624 S.W.3d at 514 (footnote omitted). Considering Doe's pleadings and briefing, we address each of his five arguments.

### 1) *Membership or Employment Within the Religious Organization*

Doe first argues that the ecclesiastical abstention doctrine is typically applied in cases involving membership or employment-related suits against religious organizations—suggesting that we decline to apply it in the instant case because Doe's suit involves neither membership in nor employment with a religious organization. We acknowledge that prior precedent involving the ecclesiastical abstention doctrine involved either membership or employment-related suits. *See generally Hosanna-Tabor*, 565 U.S. at 188; *Milivojevich*, 426 U.S. at 696; *In re Diocese of Lubbock*, 624 S.W.3d at 508-09; *Westbrook*, 231 S.W.3d at 389; *Kelly v. St. Luke Cmty. United Methodist Church*, No. 05-16-01171-CV, 2018 WL 654907 (Tex. App.—Dallas Feb. 1, 2018, pet. denied) (mem. op.); *Jennison v. Prasifka*, 391 S.W.3d 660, 668 (Tex. App.—Dallas 2013, no pet.). However, Doe does not direct us to—and we have found no—authority to support the argument that the status of a

plaintiff as neither a member nor an employee of a religious organization bars application of the ecclesiastical abstention doctrine. To the contrary, our inquiry as to the application of the ecclesiastical abstention doctrine does not depend upon a determination of *who* is the plaintiff but rather *what* constitutes "the substance and nature of the plaintiff's claims." *In re Diocese of Lubbock*, 624 S.W.3d at 516. Thus, we decline to limit the application of the ecclesiastical abstention doctrine to members or employees of a religious organization when—as discussed further below—the substance of Doe's claims asks us to evaluate whether the Dallas Diocese followed its own canonical rules and internal affairs policies. *See id.*

*2) The Policy and Religious Dogma*

Doe does not dispute that the Policy includes discretion and consideration of religious dogma. Instead, Doe argues that we may adjudicate his claim of fraud by focusing on the portions of the Policy that are grounded in its "numerous references to secular law and instructions for complying with secular law." We have held that "[e]ven if secular principles define and provide the elements of the claims asserted, determining civil liability may nonetheless impermissibly infringe on a faith-based organization's right to 'construe and administer church doctrine.'" *In re Prince of Peace Christian Sch.*, No. 05-20-00680-CV, 2020 WL 5651656, at *5 (Tex. App.—Dallas Sept. 23, 2020, no pet.) (mem. op.).

To the extent that Doe's claims call into question (i) the Dallas Diocese's investigation, (ii) communication with the public regarding Heines, (iii) reporting to

–16–

the diocesan Review Board, (iv) determining the allegation of Heines's sexual abuse, and (v) reporting to the Congregation of the Doctrine of Faith, each of those steps "necessarily reach behind the ecclesiastical curtain." *In re Diocese of Lubbock*, 624 S.W.3d at 515. As Doe pled, determining whether "the Dallas Diocese lied to Father Heines'[s] [sic] current parish about why Father Heines was removed from ministry" would require a court to evaluate whether the Dallas Diocese followed its own canonical rules and internal affairs. That is, Doe's suit asks us to determine whether a religious organization's implementation of its Policy was fraudulent. Although Doe argues the Policy (i) "relies on secular laws describing criminal sexual acts to define misconduct," (ii) is publicly available, (iii) exists to address sexual abuse of minors and vulnerable adults, and (iv) has been communicated with the Dallas Police Department, those factors do not separate the Policy from its reliance on canonical rules and its effect on governing the Dallas Diocese's internal affairs.

Since Doe's suit alleges the Dallas Diocese's implementation of its Policy was fraudulent, a court would have to evaluate whether (i) Doe had credible allegations against Heines and (ii) whether the Dallas Diocese implemented its policy under the canonical meanings of "minor," "sexual abuse," and "vulnerable adult."[14] This would necessitate a secular investigation into the Dallas Diocese's understanding of

---

[14] In *In re Diocese of Lubbock*, the Texas Supreme Court explained the terms "minor" and "vulnerable adult" contained canonical meanings in the context of the Diocese of Lubbock's publication of a list from an internal investigation of clergy credibly accused of sexual abuse of minors. *See In re Diocese of Lubbock*, 624 S.W.3d at 511, 514.

those terms—whether a court agrees that Doe qualified as a "minor" or "vulnerable adult" under the Policy at the time of the alleged "sexual abuse." *See id.* Such an inquiry would cause a court to evaluate whether the Dallas Diocese properly applied canon law[15] and "interlineate its own views" of canonical terms. *Id.*

Furthermore, in the context of a religious organization's choices in investigating and regulating its formal leaders and people ordained for religious duties, "any investigation would necessarily put to question the internal decision making of a church judicatory body." *See id.*; *see, e.g.*, *Whole Woman's Health v. Smith*, 896 F.3d 362, 373–74 (5th Cir. 2018) (holding "[b]oth free exercise and establishment clause problems seem inherent in the court's discovery order" after a trial court entered a discovery order requiring a religious organization's production of internal communications). However, courts are prohibited from investigating and resolving application of religious doctrine and practice. *In re Diocese of Lubbock*, 624 S.W.3d at 515–16 (citing *Mary Elizabeth Blue Hull*, 393 U.S. at 449). Thus, to the extent Doe's suit challenges the Diocese's application of religious dogma in its Policy, the trial court lacks jurisdiction.

### 3) Compelling Governmental Interest

Doe asserts that his fraud claim involves a compelling governmental interest, which precludes application of the ecclesiastical abstention doctrine. Doe directs us

---

[15] Merriam Webster defines "canon law" as "the usually codified law governing a church." *Canon Law*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/canon%20law (last visited July 1, 2021).

–18–

to *Pleasant Glade Assembly of God v. Schubert* wherein the Texas Supreme Court stated:

> We do not mean to imply that "under the cloak of religion, persons may, with impunity," commit intentional torts upon their religious adherents. Freedom to believe may be absolute, but freedom of conduct is not, and "conduct even under religious guise remains subject to regulation for the protection of society." Moreover, religious practices that threaten the public's health, safety, or general welfare cannot be tolerated as protected religious belief.

264 S.W.3d 1, 12 (Tex. 2008) (internal citations and parentheticals omitted). However, Doe does not direct us to authority on how a fraud claim regarding a religious organization's decisions about an internal investigation involves a compelling governmental interest—whether subject to regulation for the protection of society or otherwise as a threat to the public's health, safety, or general welfare. *See Pleasant Glade*, 264 S.W.3d at 12.

Indeed, Doe reframes his argument that his fraud claim involves a compelling governmental interest by referring to claims (and cases that are not of precedential value before our Court)[16] of sexual abuse; negligent hiring, assignment, and retention; negligent misrepresentation; and negligent supervision. However, Doe pled no claim against the Dallas Diocese separate from his fraud claim about the

---

[16] *See generally Roman Catholic Diocese of Jackson v. Morrison*, 905 So.2d 1213 (Miss. 2005); *Doe v. Diocese of Raleigh*, 242 N.C. App. 42, 776 S.E.2d 29, 32 (N.C. Ct. App. 2015). In civil matters, "this Court is bound by decisions of the United States Supreme Court, the Texas Supreme Court, and prior decisions of this Court." *Owen v. Jim Allee Imports, Inc.*, 380 S.W.3d 276, 284 (Tex. App.—Dallas 2012, no pet.).

Policy and its implementation.[17] Doe requests that our Court treat his fraud claim as though it were a claim for sexual abuse or negligence, but Doe provides no according authority which would permit such treatment. In *Pleasant Glade*, the Texas Supreme Court explained:

> "Courts are not arbiters of religious interpretation," and *the First Amendment does not cease to apply when parishioners disagree over church doctrine or practices because "it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith."*

*Pleasant Glade*, 264 S.W.3d at 13 (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 716 (1981)) (emphasis added). Thus, Doe failed to plead a suit that involves a compelling governmental interest which would permit jurisdiction over the Dallas Diocese.

### 4) *Application of Neutral Principles*

Citing *Jones v. Wolf*, Doe contends that our Court may adjudicate his claim by applying neutral principles of law, without consideration of religious doctrine. 443 U.S. 595, 604 (1979) ("We therefore hold that a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute."). The Texas Supreme Court provides:

> A court may exercise jurisdiction over a controversy if it can apply neutral principles of law that will not require inquiry into religious doctrine, interference with the free-exercise rights of believers, or

---

[17] That is, Doe's suit does not include a cause of action against the Dallas Diocese for sexual assault; battery; negligent hiring, assignment, and retention; negligent misrepresentation; and negligent supervision.

–20–

meddling in church government. Under the neutral-principles methodology, "courts decide non-ecclesiastical issues such as property ownership based on the same neutral principles of law applicable to other entities, while deferring to religious entities' decisions on ecclesiastical and church polity questions."

*In re Diocese of Lubbock*, 624 S.W.3d at 513 (internal citations and parentheticals omitted). Unlike *Jones v. Wolf* and other cases Doe cites, the instant case does not concern a dispute over property. Rather, the instant case involves a dispute over a religious organization's implementation of its own policies.[18]

Our inquiry as to whether a party's claims against a religious organization are barred by the ecclesiastical abstention doctrine is based on whether "the substance and nature of the plaintiff's claims implicate ecclesiastical matters, including a church's internal affairs, governance, or administration." *In re Diocese of Lubbock*, 624 S.W.3d at 516 (citing *Westbrook*, 231 S.W.3d at 396-97.). Here, Doe's suit seeks to impose liability on the Dallas Diocese for failing to comply with its Policy to investigate an allegation of sexual abuse alleged against one of its clergy. *See Hosanna-Tabor*, 565 U.S. at 190 (prohibiting "government interference with an internal church decision that affects the faith and mission of the church itself"). "Investigations that relate to the character and conduct of church leaders are inherently ecclesiastical." *In re Diocese of Lubbock*, 624 S.W.3d at 517. Although

---

[18] The Texas Supreme Court has not applied the neutral principles methodology outside of church property disputes. *In re Diocese of Lubbock*, 624 S.W.3d at 513. We acknowledge that our sister court has applied the neutral principles methodology in the context of a dispute over a settlement agreement. *Shannon v. Mem'l Drive Presbyterian Church U.S.*, 476 S.W.3d 612, 624–25 (Tex. App.—Houston [14th Dist.] 2015, pet. denied).

common law fraud imposes liability on those who make knowing material misrepresentations, *see JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018), "a civil suit that is inextricably intertwined with a church's directive to investigate its clergy cannot proceed in the courts." *In re Diocese of Lubbock*, 624 S.W.3d at 517. Here, as in *Westbrook* and *In re Diocese of Lubbock*, Doe's suit is "inextricably intertwined" with the Dallas Diocese's decision to investigate an allegation of sexual abuse in accordance with its internal Policy, judicial review of which would "impermissibly interfere with a religious organization's ability to regulate the character and conduct of its leaders." *Id.* at 517; *Jennison*, 391 S.W.3d at 668; *see Hosanna-Tabor*, 565 U.S. at 201.

Furthermore, Doe argues the Dallas Diocese failed to follow each step of its Policy—particularly directives that were outside of its discretion. However—even if we were to assume the Dallas Diocese failed to follow its Policy—the church's failure to follow its Policy "on a matter of internal governance is also a matter of internal church governance and ecclesiastical concerns, and the courts may not interfere with that decision." *Retta v. Mekonen*, 338 S.W.3d 72, 77 (Tex. App.—Dallas 2011, no pet.).

### 5) *Policy Efficacy and Interjection Into Public Sphere*

Citing to Citing to *In re Diocese of Lubbock*, 592 S.W.3d 196, 202 (Tex. App.—Amarillo 2019), *mandamus conditionally granted sub nom. In re Lubbock*, 624 S.W.3d 506, Doe contends that the Dallas Diocese's promulgation of the Policy,

discussions of its efficacy, and sharing with the Dallas Police Department foreclose ecclesiastical protection. But after oral argument and the submission of this case, the Texas Supreme Court rejected and overruled the Amarillo Court of Appeal's decision. *In re Diocese of Lubbock*, 624 S.W.3d at 518–19. The Texas Supreme Court explained:

> The doctrine allows a religious institution to engage freely in ecclesiastical discussions with more than just its members. *See Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 658 (10th Cir. 2002). It extends to publications that relate to a religious group's right to shape its own faith and mission. *Hosanna-Tabor*, 565 U.S. at 188, 132 S. Ct. 694. *The Diocese, in exercising its right to shape its own faith and mission, disclosed to the public its reforms to handling sexual-abuse allegations within the church. Such discussion of changes in church policy, which the Diocese explains were rooted in broader church governance decisions, do not revoke ecclesiastical protection. See, e.g.*, *Whole Woman's Health*, 896 F.3d at 374 ("[T]he importance of securing religious groups' institutional autonomy, while allowing them to enter the public square, cannot be understated ...."); *see also Hosanna-Tabor*, 565 U.S. at 201, 132 S. Ct. 694 (Alito, J., concurring) ("A religious body's control over such 'employees' is an essential component of its freedom to speak in its own voice, both to its own members and to the outside world."). Curtailing First Amendment protections when a church exercises its right to shape its own faith and mission threatens to entangle the courts in a religious dispute.

*Id.* at 518–19 (emphasis added, footnote omitted). Thus, we must conclude the Dallas Diocese's disclosure of the Policy into the public sphere and discussion of its efficacy do not revoke ecclesiastical protection. *Id.* at 519.

For those reasons, we conclude Doe's suit involved an incurable jurisdictional defect. *Id.*; *In re Episcopal Sch. of Dallas, Inc.*, 556 S.W.3d at 359. We conclude

that the trial court did not err in granting the plea to the jurisdiction and dismissing Doe's claims. We need not reach the remaining arguments by the parties. *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

## VI.   CONCLUSION

Having overruled Doe's sole issue, we affirm the judgment of the trial court.

190997f.p05

/Bill Pedersen, III//
BILL PEDERSEN, III
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JOHN DOE, Appellant

No. 05-19-00997-CV     V.

ROMAN CATHOLIC DIOCESE OF
DALLAS, Appellee

On Appeal from the 95th District
Court, Dallas County, Texas
Trial Court Cause No. DC-18-07025.
Opinion delivered by Justice
Pedersen, III. Justice Reichek
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee ROMAN CATHOLIC DIOCESE OF DALLAS recover its costs of this appeal from appellant JOHN DOE.

Judgment entered this 11th day of August, 2021.